## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

| | | |
|---|---|---|
| EVERETT CURTIS FLESHER, | ) | |
|         **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:14-30661** |
| | ) | |
| CAROLYN. W. COLVIN, | ) | |
| **Acting Commissioner of Social Security,** | ) | |
|         **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered January 8, 2015, and January 5, 2016 (Document Nos. 5 and 16.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 14.), and Plaintiff's Reply. (Document No. 15.)

The Plaintiff, Everett Curtis Flesher (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on October 7, 2011 (protective filing date), alleging disability as of October 2, 2011, due to left heel injury and degenerative arthritis in the neck and back.[1] (Tr. at 17, 177-78, 179-80, 181-86, 215.) The claims were denied initially and upon reconsideration. (Tr. at 68-71, 74-76, 80-82, 85-87, 91-93, 97-99, 101-03, 104-06, 108-10.) On January 19, 2012,

---

[1] On his form Disability Report - Appeal, dated December 29, 2011, Claimant asserted that his pain had increased and that he had limited mobility. (Tr. at 240.)

Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 111-12.) A hearing was held on May 16, 2013, before the Honorable I. K. Harrington. (Tr. at 34-67.) By decision dated September 6, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 17-28.) The ALJ's decision became the final decision of the Commissioner on October 27, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on December 23, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of

2

disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, October 2, 2011. (Tr. at 19, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "cervical spine arthropathy, post traumatic osteopenia status post left heel fracture, post traumatic arthrosis, and hypertension" which were severe impairments. (Tr. at 19, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for medium work, as follows:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can stand and walk up to one hour. The [C]laimant can sit for six hours. He requires the use [of] a hand held device. The [C]laimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. The [C]laimant must avoid occasional exposure to unprotected heights and dangerous moving machinery.

(Tr. at 21, Finding No. 5.) At step four, the ALJ found that Claimant was able to return to his past

relevant work as a truck driver. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ further concluded that Claimant could perform jobs such as a truck driver, bus driver, and taxi driver at the unskilled, medium level of exertion. (Tr. at 27-28.) On these bases, benefits were denied. (Tr. at 28, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on April 29, 1964, and was 49 years old at the time of the administrative hearing on May 16, 2013. (Tr. at 26, 179, 181.) The ALJ found that Claimant had a limited education and was able to communicate in English. (Tr. at 26, 215.) In the past, he worked as a

4

machinist, truck driver, and laborer/plastic recycling. (Tr. at 26, 57-60, 216.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below in relation to Claimant's arguments.

On June 30, 2008, Claimant presented to Morad/Hughes Health Center with complaints of pain in the right rib area after he fell on concrete. (Tr. at 352-53.) The pain was increased with rotation of the trunk and deep breaths. (Tr. at 353.) An x-ray of Claimant's right ribs on June 30, 2008, revealed mild degenerative change involving the thoracic spine. (Tr. at 350-51.)

On October 5, 2011, Claimant presented to the Trauma Clinic at WVU Hospitals and University Health Associates, for evaluation of his left foot, after he fell off his porch on October 3. (Tr. at 268-69.) He reported that he was diagnosed with a left calcaneus fracture at Camden Clark Medical Center on October 4, and was placed in a posterior splint. (Tr. at 269.) He reported a lot of pain around the foot, with reduced swelling. (Id.) The x-rays revealed a calcaneus fracture with displacement superiorly of the left foot. (Tr. at 267, 269, 366) A CT scan revealed a very large posterolateral fragment that was displaced superiorly, with posterior facet involvement. (Tr. at 267.) Dr. Michelle Bramer, M.D., recommended an open reduction internal fixation of the left calcaneus after swelling subsided. (Tr. at 270.) Dr. Bramer prescribed Percocet for pain relief. (Id.)

On follow-up examination on October 17, 2011, Claimant reported continued constant pain in the left foot, rated at a level eight out of ten, despite having taken narcotic pain relievers. (Tr. at 271.) Claimant had been non-weightbearing on crutches since the last examination. (Id.) Upon removal of the splint, physical exam revealed some edema, though there was some wrinkling of the skin on the lateral aspect. (Tr. at 272.) Sensation was intact. (Id.) Stacy Skidmore, P.A., noted that radiographs had revealed a very large posterior facet involvement of his left calcaneus. (Tr. at

5

273, 367.) She diagnosed left calcaneus fracture. (Id.) Ms. Skidmore opined that Claimant would be "totally temporarily disabled from work for approximately four to six months from the time of surgery." (Id.)

Claimant underwent open reduction and internal fixation of the left calcaneous on October 18, 2011, and tolerated the procedure well. (Tr. at 276-90.) His foot was placed in a cast and he was instructed to remain non-weightbearing on his left foot. (Tr. at 279.)

At a post-surgical follow-up examination on November 3, 2011, it was noted that Claimant had remained non-weightbearing the last two weeks. (Tr. at 274.) Ms. Skidmore noted that Claimant's wound had healed well and there was no sign of infection. (Id.) Sutures were removed and Claimant was placed back into his splint, where he was expected to continue and be non-weightbearing for twelve weeks. (Id.) Ms. Skidmore prescribed an antibiotic and pain reliever, and advised him of home exercises. (Id.)

On November 11, 2011, Claimant reported a foul odor and minimal drainage from his incision site. (Tr. at 291-93, 297-99.) The odor emanated from the steri-strips and was eliminated upon removal. (Tr. at 292.) Dr. Kristine Jaurigue Lopez, M.D., noted that Claimant's left foot was red, mildly swollen, and warm and that he had decreased sensation over the left lateral aspect of the foot. (Tr. at 299.) No motor deficits were noted. (Id.) Dr. Scott A. Cimino, M.D., assessed post-operative erythema without infection. (Tr. at 293.) Upon an orthopedics consult, it was concluded that Claimant had only a stitch abscess and was stable for outpatient follow-up. (Tr. at 301.) The x-rays of Claimant's left ankle on November 12, 2011, revealed internal fixation of calcaneal fractures with persistent soft tissue swelling and incomplete endosteal ossesous bridging, but no new abnormality. (Tr. at 368-69.) A repeat x-ray on December 7, 2011, revealed no change in alignment of Claimant's healing calcaneal fracture, as compared to the November 12, 2011, x-ray.

6

(Tr. at 370.)

On December 13, 2011, Dr. Lawrence S. Schaffzin, Opthalmologist, a State agency reviewing medical consultant, completed a form Physical RFC Assessment, on which he opined that Claimant was capable of light exertional level work, except that he could stand and walk for at least one hour in an eight-hour workday and required a hand-held assistive device for ambulation. (Tr. at 303-10.) He further opined that Claimant could never climb ladders, ropes, or scaffolds, and occasionally could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 305.) He also indicated that Claimant should avoid even moderate exposure to hazards. (Tr. at 307.) Dr. Schaffzin noted that Claimant's allegations were supported by the medical evidence, and therefore, was credible. (Tr. at 308.) He also noted that Claimant's current conditions of fracture of the left calcaneus and degenerative disc disease were severe, but not expected to last at least twelve months. (Tr. at 310.) Following a period of twelve months, Dr. Schaffzin opined that Claimant's exertional limitations would result in medium level work, with the ability to stand, walk, and sit for about six hours in an eight-hour workday. (Id.) On January 4, 2012, Dr. Fulvio Franyutti, M.D., a State agency reviewing medical consultant, reviewed the medical evidence of record and affirmed Dr. Schaffzin's assessment, as written. (Tr. at 312.)

On January 18, 2012, x-rays of Claimant's left calcaneus revealed redemonstration of internal fixation of the calcaneus with no interval change in alignment. (Tr. at 316.) His hardware appeared intact and fracture lucency was no longer visible. (Id.) Posttraumatic osteopenia was present. (Id.)

On February 24, 2012, Jessica Wooten, F.N.P., completed a form General Physical (Adults) for the West Virginia Department of Health and Human Resources, on which she noted that Claimant had Lordosis, a limping gait, and walked with crutches. (Tr. at 355.) She reported

Claimant's pain as severe neuropathic pain of the left heel, post calcaneous fracture repair. (Id.) Ms. Wooten opined that Claimant was incapable of full-time work due to the severe pain and musculoskeletal deformity. (Id.) She further opined that although Claimant could obtain part-time work, his current condition would limit the time he could have been productive. (Id.) She reported that he should avoid manufacturing work and any work that required heavy lifting. (Id.) Ms. Wooten reported that Claimant may require long-term physical therapy and pain management for strengthening, and possibly may need surgical intervention based on the results of his MRI. (Tr. at 356.) She further noted that Claimant suffered a severe orthopedic injury and was unable to recover fully due to financial and life circumstances. (Id.) Ms. Wooten opined that if Claimant was treated aggressively and correctly, "his problem may be corrected to the point [he] can return to work force full time." (Id.)

On April 4, 2012, Claimant was referred by Dr. Bramer to Dr. Paul W. Nielsen, D.O. (Tr. at 362.) Claimant reported progressively worsened and persistent left ankle, back, and neck pain. (Id.) Claimant had been unable to work since the ankle fracture, and reported difficulty completing his daily activities. (Id.) Dr. Nielsen prescribed Roxicodone 15mg, for pain. (Id.) On April 30, 2012, Claimant reported his daily pain at a level six out of ten, associated with an increase in his level of function. (Id.) He further reported significant pain when he awoke in the morning, which Dr. Nielsen noted was typical of short-acting medication. (Id.) Dr. Nielsen reported that it "is markedly noted that [Claimant] states he is able to do more than just 'lay on the couch' with his pain medication." (Id.)

On May 30, 2012, Claimant rated his daily pain at a level eight out of ten, associated with a limited level of function. (Id.) Dr. Nielsen noted that the MRI scan of Claimant's cervical and lumbar spines on April 14, 2012, demonstrated significant disc disease, but Dr. Nielsen opined

that it did "not appear to be a surgical condition at this time." (Id.) He increased the number of Claimant's pain pills per month. (Id.) On June 27, 2012, Claimant rated his daily pain at a level seven out of ten, with an improved level of function. (Id.) Dr. Nielsen noted that they were above Claimant's target for pain and function. (Id.) Claimant reported a burning, neuropathic type of pain his lower extremities, for which Dr. Nielsen prescribed Neurontin. (Id.) He referred Claimant to an orthopedist that was closer for him than the one in Morgantown. (Id.) Dr. Nielsen also discussed combination therapy, but Claimant was reluctant and chose to continue his then current, single therapy. (Id.)

Claimant presented to Ms. Wooten on August 11, 2012, for a routine visit, at which time he reported congestion and elevated blood pressure. (Tr. at 339-42.) Claimant reported a five out of ten left heel pain level. (Tr. at 340.) Ms. Wooten assessed Claimant's back as "normal" on physical examination. (Tr. at 341.) She assessed hypertension, chronic obstructive pulmonary disease ("COPD"), and nicotine dependence, for which she provided education and medication. (Tr. at 341-42.)

On December 20, 2012, Dr. Kimberly Burgess, M.D., an orthopedic specialist, examined Claimant upon reports pain in his left foot. (Tr. at 334.) Claimant reported that uneven ground and standing for long periods of time caused considerable pain and swelling. (Id.) He indicated that he "feels like hamburger" without any cushion. (Id.) Claimant stated that he was unable to resume his lifelong work as a machine operator, as it involved standing and climbing. (Id.) Physical exam revealed some decreased motion of his left ankle with tenderness. (Id.) Dr. Burgess noted that the heel pad was thin, but sensation in the remainder of the foot was intact. (Id.) She noted that the result of the surgery was quite good regarding the reduction and healing and that his subjective feelings of pain and discomfort were a common result related to the amount of energy that caused

the fracture. (Id.) Dr. Burgess opined that it was unlikely that Claimant would be able to return to his prior employment. (Id.) She continued his pain management with Dr. Nelson and prescribed a shoe insert or special shoes for Claimant to wear. (Id.)

On January 14, 2013, Claimant reported that his blood pressure medication made him fatigued. (Tr. at 343.) Ms. Murrita C. Bolinger, F.N.P., noted that Claimant was self-reliant in usual daily activities and fully was able to manage his household. (Id.) Claimant reported left heel and hip pain at a level seven out of ten. (Tr. at 344.) She assessed fracture of the calcaneus and nicotine dependence and continued his medication. (Id.) On February 7, 2013, Claimant continued to complain of fatigue. (Tr. at 345.) Ms. Wooten noted his active problems to have included atypical chest pain and GERD, fatigue, fracture of heel, systemic hypertension, and obesity. (Id.) Claimant reported neck and foot pain at a level five out of ten. (Tr. at 347.) On physical exam, Ms. Wooten noted that Claimant's gait and stance were normal and that findings were unremarkable. (Id.)

Claimant was referred by Dr. Nielsen, to C. P. Mayo, F.N.P. – B.C., at the PARS Pain Center on April 17, 2013, for pain management consultation and evaluation of bilateral neck pain with a four year history. (Tr. at 357-61.) Claimant described his pain as sharp, shooting, and burning in nature, which was localized to the bilateral posterior region. (Tr. at 357.) He stated that he felt pressure on the head into the shoulders and that the pain radiated into his bilateral arms and hands. (Id.) He further reported bilateral hand numbness. (Id.) Claimant rated the pain at a level six out of ten. (Id.) Claimant reported that was worse in the morning and was aggravated by standing, walking, and lifting. (Id.) Physical examination was unremarkable with the exception of some decreased range of left ankle and foot motion and an antalgic gait, accompanied by some difficulty standing using a cane. (Tr. at 359-60.) Otherwise, Dr. Mayo noted normal ranges of

motion, reflexes, strength, tone, reflexes, and sensation. (Id.) He assessed cervical radiculitis, myofascial pain, occipital neuralgia, cervical spine arthropathy, tobacco use disorder, and lumbosacral radiculitis. (Tr. at 360.) He recommended nerve blocks, steroid injections, and prescription medications. (Id.) On May 2 and 17, 2013, Claimant underwent cervical medial branch block injections by Dr. Pantelidis. (Tr. at 378-89.)

Evidence Submitted to the Appeals Council:

On September 19, 2013, Claimant presented to the emergency department at Morad Hughes Health Center and requested an MRI based on Dr. Nielsen's diagnosis of spinal stenosis. (Tr. at 391-92.) He reported headaches and grinding pain in the cervical spine area, which he rated at a level eight out of ten. (Tr. at 391.)

The evidence also included Dr. Nielsen's treatment records from April 3, 2013, through October 16, 2013, at Jackson Pain Clinic. (Tr. at 395-97.) On April 3, 2013, Claimant reported increased pain through his neck that radiated into the proximal thoracic spine. (Tr. at 395.) He rated the pain at a level five out of ten, associated with an increased and adequate level of function. (Id.) Dr. Nielsen noted that MRI scans revealed disease and arthritic changes that did not appear to suggest surgical intervention. (Id.) He referred Claimant to PARS Wellness Center for evaluation. (Id.)

Dr. Pantelidis evaluated Claimant's cervical pain, low back pain, and occipital neuralgia, on April 17, 2013. (Tr. at 398-403.) Claimant reported bilateral neck pain with a four-year history that he rated at a level six out of ten. (Tr. at 399.) He described the pain as sharp, shooting, and burning in nature, which was localized to the bilateral posterior region. (Id.) The pain was worse in the mornings and was aggravated by walking, standing, and lifting. (Id.) Dr. Pantelidis noted on physical exam that Claimant ambulated with a cane, had an antalgic gait, and was able to stand

11

with difficulty using the cane. (Tr. at 401-02.) He presented with decreased range of cervical spine and left ankle motion. (Id.) Otherwise, the physical and mental status exams were unremarkable. (Id.) Dr. Pantelidis assessed cervical and lumbosacral radiculitis, myofascial pain, occipital neuralgia, cervical spine arthropathy, and tobacco use disorder. (Tr. at 402.) He recommended cervical medial branch blocks, epidural steroid injections, a trial of Tizanidine for myofascial spasms, and pain gel for the knee and foot pain. (Id.)

Claimant returned to Dr. Nielsen on May 1, 2013, and rated his pain at a level six out of ten, associated with a level of function somewhat below his target. (Tr. at 395.) Dr. Nielsen prescribed combination therapy, which consisted of Fentenyl and Oxycodone for breakthrough pain. (Id.) On May 29, 2013, Claimant again rated his pain at a level six out of ten, associated with an improved level of function. (Id.) He reported increased pain over the past few weeks since his second series of injections by Dr. Pantelidis. (Id.) Claimant did not believe that the injections provided any relief. (Id.) Dr. Nielsen discontinued the Fentanyl patches and prescribed Opana and Roxycodone. (Id.) On June 26, 2013, Claimant reported pain at a level five out of ten, associated with an improved and adequate level of function. (Id.) Claimant reported that his pain level was improved with the switch to combination therapy, though he continued to report significant times of breakthrough pain. (Id.) Claimant did not receive his third series of spinal injections, and believed that they were of little benefit. (Tr. at 395-96.) He was prescribed Oxymorphone and Roxicodone. (Tr. at 396.)

On July 24, 2013, Claimant rated his average daily pain at a level four out of ten, associated with an increased level of function. (Tr. at 396.) He noted that he received added benefit from the combination therapy. (Id.) He continued to report however, significant neck and low back pain. (Id.) Although his MRI scans revealed significant pathology, Dr. Nielsen noted that they did not

present surgical intervention. (Id.) He continued his combination therapy and added Zanaflex for muscle spasm, and recommended use of an inversion table. (Id.) On August 21, 2013, Claimant rated his average daily pain at a level five out of ten, associated with an increased level of function. (Id.) He again noted added benefit from the combination therapy and Zanaflex. (Id.) Claimant had not yet tried an inversion table for his neck and back pain. (Id.) Dr. Nielsen continued his medications. (Id.)

On September 18, 2013, Claimant rated his average daily pain at a level six out of ten, associated with a marginal level of function. (Tr. at 396.) He complained of significant pain through his cervical spine, which was of increasing severity, as well as some paresthesia down the lower aspect of his right arm and hand. (Id.) Dr. Nielsen referred him to his family physician for an MRI of the cervical spine, and increased the dosage of his medications. (Id.) On October 16, 2013, Claimant rate his average daily pain at a level six out of ten, associated with a marginal level of function. (Tr. at 396-97.) Due to difficulties in obtaining Opana from the pharmacy, Dr. Nielsen prescribed OxyContin 30mg and Oxycodone 15mg. (Tr. at 397.)

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to obtain an updated medical opinion, when additional medical evidence was received that could have modified the opinion of the State agency medical expert. (Document No.11 at 6-8.) Claimant asserts that the ALJ improperly relied upon the opinions of Drs. Schaffzin, and Franyutti, and Mr. Eckart, despite the creation of more than 100 pages of additional medical evidence since the State agency medical experts rendered their opinions, the ALJ. (Id. at 7-8.) Pursuant to SSR 96-6p, Claimant asserts that either the ALJ or the Appeals Council was required to obtain an updated medical opinion that incorporated review of the

additional medical opinion. (Id. at 8.) Accordingly, Claimant contends that remand is required. (Id.)

Citing a decision from the Third Circuit Court of Appeals, the Commissioner responds that the Regulations do not impose any limit on the amount of time permitted to pass between a report and the ALJ's decision in reliance on the report. (Document No. 14 at 11-13.) The Commissioner asserts that the ALJ's RFC reasonably was consistent with the opinions of Drs. Schaffzin and Franyutti. (Id. at 12.) The Commissioner notes that neither of Claimant's orthopedic specialists assessed any limitations that precluded work activity. (Id.) The Commissioner therefore contends, that the ALJ accounted for all of Claimant's functional limitations that were established in the record and that his reliance upon the State agency physicians is supported by substantial evidence. (Id. at 12-13.)

Claimant asserts in reply that the Commissioner fails to acknowledge that Dr. Schaffzin's opinion, as affirmed by Dr. Franyutti, "was nothing more than a predicted residual functional capacity based on the medical evidence then available for review." (Document No. 15 at 3.) Claimant asserts that since the opinions were rendered, evidence was added to the record that established that Claimant did not heal or regain functioning as Dr. Schaffzin expected. (Id.) In addition to relying upon opinions based on a prediction, Claimant asserts that the ALJ further erred in relying on the same evidence to formulate hypothetical questions to the VE and in assessing his RFC. (Id. at 4.)

Second, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that his left heel impairment did not meet or equal Listings 1.02 or 1.03. (Document No. 11 at 8-10.) Claimant asserts that contrary to the ALJ's finding that there neither was evidence of his inability to ambulate effectively nor effective

ambulation within twelve months of onset, the evidence demonstrated that Claimant walked with an antalgic gait, had difficulty standing, and used a cane for stability. (Id. at 8-9.) Accordingly, Claimant contends that remand is required for the ALJ's failure to evaluate properly his heel impairment. (Id. at 10.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's finding that Claimant's impairment did not meet or equal Listing 1.02. (Document No. 14 at 10-11.) The Commissioner asserts that pursuant to Listing 1.00B2b, effective ambulation required a reasonable walking pace over a sufficient distance to carry out daily activities. (Id. at 11.) Ineffective ambulation includes the inability to walk without the use of a walker, two crutches, or two canes. (Id.) The Commissioner asserts that Claimant's treatment records from Drs. Bramer and Burgess did not indicate an inability to ambulate effectively and Ms. Wooten's examination revealed a normal gait and stance. (Id.) Furthermore, the Commissioner notes that Claimant purchased a cane on his own volition and not pursuant to a prescription. (Id.) Accordingly, the Commissioner contends that Claimant failed to meet his burden of proving that his impairment met Listing 1.02 or 1.03. (Id.) Claimant notes in reply that Dr. Schaffzin noted that Claimant's use of a hand-held assistive device was medically required and necessary for ambulation. (Document No. 15 at 4.)

Thirdly, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to follow the slight abnormality standard in finding that his thoracic and lumbar disorders were non-severe impairments. (Document No. 11 at 10-12.) Although the ALJ summarized the MRI evidence of bulging discs, she failed to find them severe or consider them as medically determinable impairments. (Id. at 11.) He asserts that the ALJ ignored evidence from Dr. Pantelidis relating to these conditions, as well as Claimant's testimony of pain and other evidence of low back pain. (Id.) He contends that the evidence demonstrated that

his lumbar and thoracic conditions were more than a slight abnormality that affected his ability to engage in work activity. (Id. at 12.) He further asserts that the ALJ's error is not harmless because the resulting limitations from the conditions had a significant impact on the ALJ's RFC findings. (Id.)

In response, the Commissioner asserts that the ALJ found in Claimant's favor at step two and found that he suffered from the severe impairments of cervical spine arthropathy, post traumatic osteopenia status left heel fracture, post traumatic arthrosis, and hypertension. (Document No. 14 at 9-10.) Nevertheless, the Commissioner further asserts that beyond step two, the ALJ considered the combined effects of all of Claimant's impairments, which included the thoracic and lumbar conditions, and therefore, Claimant's argument is without merit. (Id. at 10.)

Claimant replies that harmless error can be found for failure to include impairments at step two, only when the impairments were considered at the subsequent steps of the evaluation process. (Document No. 15 at 1-3.) He asserts that the ALJ did not consider his thoracic and lumbar conditions at the subsequent steps. (Id. at 2.) He states that there was "no indication anywhere in the decision that the ALJ considered the effects of [his] thoracic and lumbar impairments on his ability to perform work-related activities." (Id.) Consequently, the ALJ's failure to consider the thoracic and lumbar conditions at step two is not harmless error. (Id. at 3.)

Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the evidence from Jackson Pain Clinic, which was submitted to the Appeals Council, warranted remanded under sentence six. (Document No. 11 at 12-14.) Claimant asserts that the newly submitted evidence pertained to medical treatment prior to the administrative hearing and the ALJ's decision, and related to the treatment of Claimant's pain through a combination therapy of Fentanyl, Oxycodone, and spinal injections. (Id. at 13.) The evidence

demonstrated that the injections did not provide any relief and further evidenced increasing pain and paresthesia of the right upper extremity. (Id.) The evidence therefore, was relevant and not cumulative. (Id.) Claimant further asserts that the evidence was material in that it may reasonably have changed the Commissioner's findings, regarding functional limitations stemming from his low back pain and lumbar impairment. (Id.) Claimant notes that the Appeals Council made no mention of the evidence in its denial, but that the evidence was essential to an effective determination of Claimant's RFC. (Id. at 13-14.) Consequently, Claimant contends that he satisfied the good cause and general showing prongs of the analysis of newly submitted evidence. (Id.)

In response, the Commissioner asserts that the evidence submitted to the Appeals Council, which consisted of Claimant's request for an MRI and records from Jackson Pain Clinic from April 3, 2013, through October 16, 2013, did not constitute a basis for remand. (Document No. 14 13-15.) First, the Commissioner notes that the Appeals Council acknowledged in its decision that the new evidence was considered and did not provide a basis for changing the ALJ's decision. (Id. at 14.) Second, the Commissioner asserts that the new evidence did not demonstrate that the spinal injections were without benefit, despite Claimant's argument to the contrary. (Id. at 15.) Although his pain increased from a level four in July 2013, to a level five out of ten in August 2013, the Commissioner notes that he failed to try an inverse table as recommended by his providers. (Id.) Finally, the Commissioner asserts that the new evidence did not call into question the ALJ's decision or mandate a different conclusion. (Id.) The Commissioner therefore contends that Claimant failed to meet his burden and that the ALJ's decision is supported by substantial evidence. (Id.)

Claimant asserts in reply that the ALJ failed to analyze properly the severity of his lumbar impairments and that the newly submitted evidence demonstrated a worsening of the condition,

despite treatment. (Document No. 15 at 5.) Additionally, the evidence demonstrated right upper extremity paresthesia, which would have resulted in additional limitations in the ALJ's RFC. (Id.) Claimant therefore contends that remand is required for the ALJ to consider the additional evidence. (Id.)

Analysis.

1. Medical Opinions.

Claimant first alleges that the ALJ erred in failing to obtain an updated medical expert opinion. (Document No. 11 at 6-8.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2013). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical

18

signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2013). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In her decision, the ALJ gave great substantial weight to the opinions of Drs. Schaffzin and Franyutti substantial weight. (Tr. at 25-26.) Regarding the subsequent opinion of Ms. Wooten, the ALJ noted that Ms. Wooten was not an acceptable medical source, but given that she was a treating provider, the ALJ found that her opinion that Claimant was unable to work full time was not entitled to any special significant weight and that her further opinions were given probative weight. (Tr. at 25.) Claimant contends that the ALJ was required to obtain an updated medical expert opinion because Drs. Schaffzin and Franyutti did not consider the entire record as their opinions were rendered on December 13, 2011, and January 4, 2012, respectively. Pursuant to SSR 96-6p, an ALJ "must obtain an updated medical opinion from a medical expert" in two circumstances: (1) "When no additional medical evidence is received, but in the opinion of the administrate law judge…the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable," or (2) "[w]hen additional medical evidence is received that in the opinion of the administrative law judge…may change the State agency medical

or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments. 1996 WL 374180,*3-4.

The evidence submitted after Dr. Franyutti's January 4, 2012, opinion, included x-rays of Claimant's ankle and treatment notes from Ms. Wooten, Dr. Nielsen, Dr. Burgess, and Dr. Mayo. As will be discussed below, the evidence reflected Claimant's conservative treatment and essentially normal physical examination findings. As the Commissioner asserts, the ALJ accounted for all the limitations supported by the record, and therefore, the ALJ was not required to obtain an additional medical expert opinion. The undersigned finds that Claimant's argument is without merit.

2.  Listing Level Impairments.

Claimant next alleges that the ALJ erred in failing to find that Claimant's left heel impairment did not meet or equal Listings 1.02 or 1.03. (Document No. 11 at 8-10.) The Listing of Impairments describes, for each of the major body systems, impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience. 20 C.F.R §§ 404.1525(a); 416.925(a) (2013); see also Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990). Listings 1.02 and 1.03 deal with disorders of the musculoskeletal system. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 (2013.) Section 1.02 provides criteria for determining whether an individual is disabled by major dysfunction of a joint, "characterized by gross anatomical deformity…chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint." Id. at 1.02. In addition to these basic characteristics, the severity criteria of Listing 1.02 are met by satisfying the following requirements:

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or

20

ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Id. Listing 1.03 involves reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, "with inability to ambulate effectively…and return to effective ambulation did not occur, or is not expect to occur, within 12 months of onset." Id. at 1.03.

In the instant case, the ALJ evaluated Claimant's post traumatic osteopenia status post left heel fracture and post traumatic arthrosis under Listings 1.02 and 1.03. (Tr. at 21.) The ALJ concluded that there was a lack of evidence that Claimant had "inability to ambulate effectively, or that effective ambulation did not occur within 12 months of onset as required to meet or equal the Listing." (Tr. at 21.) The Regulations explain that an inability to ambulate effectively "means an extreme limitation of the ability to walk…having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. at § 1.00B2b(1). Examples of ineffective ambulation include, but are not limited to, the following:

the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the ability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Id. at § 1.00B2b(2).

A review of the record substantially supports the ALJ's conclusion that the evidence failed to demonstrate Claimant's inability to ambulate effectively, or that effective ambulation did not

occur within twelve months of the alleged onset. As noted elsewhere in the ALJ's decision, Ms. Wooten noted that Claimant had normal gait and stance on February 7, 2013, and she discussed with him her concerns about his inadequate physical activity. (Tr. at 23, 347.) The medical record revealed that Dr. Schaffzin noted that Claimant used a hand-held assistive device for ambulation (Tr. at 303-10.); Ms. Wooten observed on February 24, 2012, that he had a limping gait and used crutches (Tr. at 355.), Dr. Pantelidis noted on April 17, 2013, that Claimant ambulated with a cane, had an antalgic gait, and stood with difficulty using a cane (Tr. at 401-02.); and finally Dr. Mayo noted on April 17, 2013, that he had an antalgic gait and had difficulty standing with a cane. (Tr. at 359-60.) Though Claimant walked with some pain and had some difficulty standing, there is no evidence that he had an extreme limitation in his ability to walk. There is no record of Claimant having been prescribed a cane. Rather, he testified that he purchased the cane at Rite Aid. (Tr. at 55.) There further is no record that he used a walker, two canes, or two crutches except on one occasion as observed by Ms. Wooten. Claimant never used an assistive device that limited the function of both upper extremities. The ALJ noted that Claimant fully was self-reliant in his usual daily activities and fully was able to manage his household. (Tr. at 25.) Accordingly, although there is evidence that Claimant suffered from an ankle impairment, the evidence is insufficient to demonstrate the severity criteria of Listings 1.02 and 1.03.

3. <u>Severe Impairments</u>.

Claimant further alleges that the ALJ erred in failing to follow the slight abnormality standing in finding that his thoracic and lumbar disorders were non-severe impairments. (Document No. 11 at 10-12.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or

mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2013). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."); SSR 96-3p (An impairment "is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In her decision, the ALJ found that Claimant suffered from the severe impairments of cervical spine arthropathy, post traumatic osteopenia status post left heel fracture, post traumatic arthrosis, and hypertension. (Tr. at 19.) Of Claimant's remaining impairments, the ALJ concluded

23

that his COPD and GERD were controlled, and that his obesity caused no more than minimal limitations. (Tr. at 19-20.) These three impairments therefore, were non-severe. (Id.) Claimant asserts that the ALJ erred in not finding his thoracic and lumbar disorders severe impairments. The Commissioner argues that even if the ALJ erred at step two in failing to find the conditions severe, the error was harmless because she considered the combined effects of all Claimant's impairments, including his lumbar and thoracic conditions. In assessing Claimant's RFC, the ALJ acknowledged the MRI scans of Claimant's lumbar spine, which demonstrated disc bulging at T12-L1 and L2-L3. (Tr. at 23.) She further acknowledged Dr. Nielsen's finding that the scans revealed significant disc disease, but that the condition did not warrant surgical intervention. (Tr. at 23, 362.) Dr. Nielsen noted Claimant's report that he was able to do more than lay on the couch. (Tr. at 362.) The ALJ also summarized Claimant's treatment with Dr. Nielsen regarding his back pain. (Tr. at 23.) It is clear therefore, from the face of the ALJ's decision that she acknowledged and considered Claimant's lumbar and thoracic conditions when she assessed Claimant's RFC. The undersigned therefore finds that any error the ALJ may have committed in not finding these conditions as severe impairments is harmless as she considered them in the subsequent stages of her decision.

4. Evidence Submitted to the Appeals Council.

Finally, Claimant alleges that remand is required for further consideration of the evidence submitted to the Appeals Council. (Document No. 11 at 12-14.) In considering Claimant's argument for remand, the Court notes initially that the social security regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.   42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97-98, 111

S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991).   Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.   42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.   The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.   Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.

To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[1]   In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met:   (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence

---

[1] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in *Borders* provides the proper test in this circuit for remand of cases involving new evidence.   This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent   Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).   The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, Borders has not been expressly overruled.   Further, the Supreme Court of the United States has not suggested that *Borders*' construction of §   405(g) is incorrect. Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent *Borders* inquiry.

*Brock v. Secretary, Health and Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D. W.Va. 1992) (citations omitted).

25

when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.   Id.

With regard to the new evidence submitted, the Claimant has not satisfied all four factors of Borders, and therefore, remand on the basis of new evidence is inappropriate. Claimant submitted to the Appeals Council records from Morad Hughes Health Center, treatment notes from Dr. Nielsen from April 3, 2013, through October 16, 2013, and an evaluation note from Dr. Pantelidis on April 17, 2013. (Tr. at 390-403.) These documents essentially regard Claimant's cervical, thoracic, and lumbar spine conditions and the treatment thereof through combination therapy, nerve blocks, and steroid injections. (Id.)

Under the Borders analysis, the undersigned first finds that the evidence is relevant to the determination at the time the application was filed, as the treatment records were created prior to the date of the ALJ's decision.

Under the second step of the Borders analysis, the undersigned finds that the evidence is not material. With the exception of expanded treatment, the notes from Drs. Nielsen and Pantelidis are cumulative of the evidence considered by the ALJ. Although Claimant alleges that the records reflect a worsening of his back conditions, his reported daily level of severity is consistent with the records considered by the ALJ. Dr. Pantelidis essentially noted a normal physical exam, and Dr. Nielsen's records reflected waxing and waning complaints, similar to the records reviewed by the ALJ. On one occasion, Claimant reported that his pain level improved with the introduction of combination therapy. (Tr. at 395.) At his next visit, he rated his pain level even lower. (Tr. at 396.) The evidence also suggested that Claimant had not tried an inversion table for pain relief, as recommended by Dr. Nielsen. (Id.) Consequently, the evidence did not demonstrate a worsening of Claimant's back conditions. Claimant does not therefore, meet the second step of the Borders analysis.

Claimant also does not meet the third step in the Borders analysis. He fails to allege any good cause for his failure to submit the records prior to the ALJ's decision.

Finally, Borders requires that the Claimant present at least a general showing of the new evidence to the Court. Claimant submitted the treatment records to the Appeals Council and the exhibits were made a part of the administrative record which is available for the Court's review. Claimant therefore satisfies the fourth step in the Borders analysis.

The Claimant has failed to satisfy all four factors of Borders and, therefore, remand would be inappropriate; the treatment records submitted to the Appeals Council and to the Court are not material and therefore, fail to provide a basis for changing the ALJ's decision. The undersigned finds that remand is not warranted in this matter and that the Commissioner's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 1, 2016.

Omar J. Aboulhosn
United States Magistrate Judge